Kirk A. Pasich (SBN 94242)
kpasich@pasichllp.com
PASICH LLP
10880 Wilshire Blvd., Suite 2000
Los Angeles, CA 90024
Telephone: (424) 313-7860
Facsimile: (424) 313-7890

Shaun H. Crosner (SBN 259065)
scrosner@pasichllp.com
Michael S. Gehrt (SBN 246450)
mgehrt@pasichllp.com
Jacquelyn M. Mohr (SBN 278337)
jmohr@pasichllp.com
PASICH LLP
1230 Rosecrans Ave., Suite 690
Manhattan Beach, CA 90266
Telephone: (424) 313-7860
Facsimile: (424) 313-7890

Raymond C. Silverman*
rsilverman@yourlawyer.com
Jay L.T. Breakstone*
jbreakstone@yourlawyer.com
Harrison M. Biggs*
hbiggs@yourlawyer.com
PARKER WAICHMAN LLP
6 Harbor Park Drive
Port Washington, NY 11050
Telephone: (516) 723-4611
Facsimile: (516) 723-4711

Attorneys for Plaintiffs

*Pro hac vice application to be filed

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SELANE PRODUCTS, INC., on behalf of itself and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CONTINENTAL CASUALTY COMPANY,<br><br>Defendant. | Case No. 2:20-CV-07834<br><br>**CLASS ACTION COMPLAINT FOR**:<br><br>1. BREACH OF CONTRACT;<br><br>2. TORTIOUS BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;<br><br>3. UNFAIR BUSINESS PRACTICES IN VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE SECTION 17200, ET SEQ.; AND<br><br>4. DECLARATORY RELIEF<br><br>**DEMAND FOR JURY TRIAL** |

1    Plaintiff Selane Products, Inc. ("Selane"), on behalf of itself and the other

2  members of the below-defined Class and Subclasses (collectively, the "Class

3  Members"), brings this class action against defendant Continental Casualty

4  Company ("Continental") and alleges as follows:

5                          **NATURE OF THE ACTION**

6    1.    For more than 60 years, Selane has manufactured dental appliances for

7  California's residents, providing them with custom-made braces, retainers,

8  mouthguards, artificial teeth, dental crowns and bridges, fillings, and other

9  orthodontic appliances.  Like thousands of other California businesses, Selane was

10 forced to suspend its operations, and had the use and functionality of its premises

11 substantially impaired, due to SARS-CoV-2, COVID-19, the subsequent actions and

12 orders of state and local civil authorities, guidance from the Centers for Disease

13 Control and Prevention, and the need to mitigate its losses and damage.  As a result,

14 Selane has suffered, and continues to suffer, substantial financial losses.

15    2.    When Selane and other California small businesses turned to

16 Continental, their long-time commercial property and business interruption insurer,

17 Selane and the other insureds reasonably expected Continental to afford coverage

18 for their financial losses under their Connect business owners' insurance policies.

19 After all, Continental had for years marketed its policies specifically to small

20 businesses like Selane, touting the broad coverage they provide and promising

21 California's small businesses "superior protection in an unpredictable business

22 environment."  https://www.cnacentral.com/cnac/pdf/CNA Connect_ Hyperlink.pdf.

23 However, instead of honoring its promises to Selane and other California small

24 businesses, Continental has wrongfully withheld the policy benefits that these

25 businesses are entitled to receive—and that they need to weather the circumstances

26 associated with the spread of SARS-CoV-2 and actions to "flatten the curve,"

27 rebound from their financial losses, and continue operating as productive members

28 of California's economy.  Selane is informed and believes, and on that basis alleges,

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

1    that Continental has improperly withheld these benefits from Selane and the other

2    Class Members on a widespread, systematic, and uniform basis.

3          3.      Worse yet, Continental and its corporate affiliates have conspired in an

4    improper attempt to dissuade insured businesses from pursuing coverage for their

5    losses.  As detailed below, the reprehensible tactics employed by Continental and its

6    cohorts have included the coordinated dissemination of misinformation, including in

7    public misstatements by the CEO of Continental's corporate parent, designed to

8    mislead California businesses and the general public into thinking that Connect

9    business owners' insurance policies do not cover financial losses attributable to

10   SARS-CoV-2, COVID-19, and associated actions and orders of civil authorities—

11   when, in fact, the Connect policies cover such losses and do not conspicuously,

12   plainly, clearly, and unambiguously exclude coverage for such losses.

13         4.      Put simply, there is no merit to Continental's refusal to honor its

14   contractual promises to Selane and other Class Members.  In selling its broad, "all

15   risk" Connect business owners' policies to Selane and other small businesses in

16   California, Continental promised to provide coverage for financial losses

17   attributable to "direct physical loss of or damage to property" as insured under

18   Continental's policies unless an exclusion clearly and conspicuously applied as a bar

19   to coverage.  Pursuant to governing principles of California insurance law, as well

20   as authority from other states throughout the country, the presence of SARS-CoV-2

21   (the virus that causes COVID-19) in a building's airspace and on or around property

22   constitutes "direct physical loss of or damage to property."  Even if it did not, the

23   closure, "stay-at-home," and other orders of civil authorities substantially impaired

24   the insured properties and other properties and rendered them incapable of fulfilling

25   their intended function.  Furthermore, even though the insurance industry has

26   employed a standard-form "virus" exclusion since 2006 and has known of the risk

27   of pandemics for years, Continental sold the Connect policies issued to Selane

28

1  and the other Class Members without any exclusions for financial losses attributable

2  to viruses, communicable diseases, or pandemics.

3      5.     By this lawsuit, Selane and the Class Members seek damages to

4  compensate them for Continental's contractual breaches and bad faith conduct.

5  They also seek declaratory and injunctive relief confirming that their losses are

6  covered, prohibiting Continental from denying coverage for their losses, and

7  requiring Continental to publicly correct misstatements made by it and its corporate

8  affiliates regarding the availability of insurance coverage for losses attributable to

9  SARS-CoV-2, COVID-19, and associated actions and orders of civil authorities.

10                          **THE PARTIES**

11      6.     Selane is a California corporation doing business in Chatsworth,

12  California, and in the County of Los Angeles.

13      7.     Selane is informed and believes, and on that basis alleges, that

14  Continental is an Illinois corporation, with its principal place of business in Chicago,

15  Illinois.  At all times material hereto, Continental was licensed to transact, and did

16  transact, business in California and the County of Los Angeles.

17      8.     Selane is informed and believes, and on that basis alleges, that

18  Continental is a subsidiary of CNA Financial Corporation and a member of the

19  CNA group of insurance companies.  Selane is informed and believes, and on that

20  basis alleges, that Continental and the other CNA Financial Corporation insurance

21  companies are, and hold themselves out as being, extremely sophisticated and

22  knowledgeable in insuring against property and business interruption losses, and in

23  investigating the risks they are insuring.  Selane is informed and believes, and on

24  that basis alleges, that Continental and the other CNA companies participate in a

25  wide range of first-party property insurance programs and hold themselves out as

26  being knowledgeable, experienced, and reliable, and willing to insure, and capable

27  of insuring, substantial property and business interruption losses.

28

9.     On the CNA website, Continental and its corporate affiliates purport to "focus on . . . providing insurance solutions that allow [their insureds] to better manage their risk and grow profitably." https://www.cna.com/web/guest/cna/about/aboutcna.

10.     Continental also tells their insureds that they "know[] how to protect the business that you've built, so that you don't have to worry." https://www.cna.com/web/guest/cna/ps/?industry=Technology &specialization=AnySpecialization&businessSize=Small.  Continental and its affiliates boast that, "[w]ith more than a century of experience, [they have] developed a reputation for offering more than just a policy" to their insureds, adding that they "deliver expertise that helps small business owners tackle their challenges and risks." https://www.cna.com/web/guest/cna/ps/?&businessSize=Small.  They also stress that their "CNA Connect" business owners' policy "was created specifically for small business owners" and "offers broad and relevant coverage" for, among other things, risks to business income.  https://www.cna.com/web/guest/cna/ps/products/CT-TechCNAConnectProdS?industry=Technology&businessSize=Small.

## JURISDICTION AND VENUE

11.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. section 1332(d) because (a) at least one member of the proposed Class is a citizen of a state different from that of Continental, (b) the amount in controversy exceeds $5,000,000, exclusive of interest and costs, (c) there are at least 100 class members, and (d) none of the exceptions under 28 U.S.C. section 1332(d) apply to this action.

12.     This Court has personal jurisdiction over Continental because Continental is registered to do business in California, has sufficient minimum contacts in California, and otherwise intentionally avails itself of the markets within California through its business activities, such that the exercise of jurisdiction by

1  this Court is proper.  Moreover, the claims of Selane and the Class Members arise
2  out of and directly relate to Continental's contacts with California.

3        13.    Venue is proper in this District under 28 U.S.C. section 1391(b)
4  because a substantial part of the events or omissions giving rise to Plaintiffs' claims
5  occurred in this District.  Continental also has marketed, advertised, sold, and
6  maintained insurance policies, and otherwise conducted extensive business, within
7  this District.

8        **THE "CNA CONNECT" POLICY ISSUED BY CONTINENTAL**

9        14.    Continental issued Selane a "CNA Connect" business owner's policy,
10 Policy No. B 4024035722, for the period of August 6, 2019, to August 6, 2020 (the
11 "Policy").  A true and correct copy of the Policy is attached hereto as Exhibit A and
12 incorporated herein by reference.  In advance of issuing the Policy to Selane,
13 Continental engaged in, or had reasonable opportunities to engage in, extensive
14 underwriting investigation, and became familiar and knowledgeable regarding the
15 nature and scope of Selane's business and the nature of the risks that it was insuring
16 against.

17       15.    The Policy is an "all risk" property insurance policy—that is, a policy
18 that covers all risks of physical loss and damage except those plainly, clearly,
19 conspicuously, and expressly excluded.  Unlike "enumerated perils" property
20 insurance policies, which cover only certain causes of loss, "all risk" property
21 insurance policies provide broad coverage for unprecedented and unanticipated risks
22 of loss.  The Policy insures, among other things, Selane's interests in the real and
23 personal property at the scheduled location, 9129 Lurline Ave, Chatsworth, CA
24 91311.

25       16.    The Policy is comprised of a number of forms and endorsements that
26 define the scope of coverage.  Like most commercial property insurance policies,
27 the Policy insures not only against physical loss of or damage to covered property,
28 but also for resulting economic and financial losses.  This coverage is referred to in

6

the Policy as "Business Income and Extra Expense" coverage.  *See* Ex. A, "Business Income and Extra Expense" Endorsement, Form SB146802E04 (Ed. 6-16).

17.    The Policy's Business Income and Extra Expense coverage is designed, understood, stated, and intended to cover insureds, like Selane, for economic losses, including losses from the interruption and/or reduction of its business, suffered as a result of "direct physical loss of or damage to covered property."  Under this coverage, Continental agreed to pay for Selane's actual loss of Business Income sustained due to the necessary "suspension" of the insured's operations.  *Id.*  The term "suspension" is defined in the Policy to mean a "partial or complete cessation" of business activities at the insured's covered location.  *Id.*

18.    The Policy also covers "Extra Expense," which the Policy defines as the "reasonable and necessary expenses you incur during the 'period of restoration' that you would not have incurred if there had been no direct physical loss of or damage to property . . . ."  *Id.* Pursuant to the Policy's "Extra Expense" coverage, Continental is obligated to pay for the "Extra Expense" incurred to "(1) avoid or minimize the 'suspension' of business and to continue 'operations' . . .  or (2) minimize the 'suspension' of business if [the insured] cannot continue 'operations.'"  *Id.*

19.    The Policy also extends coverage for Business Income losses suffered and Extra Expense incurred as a result of an action of a civil authority.  *See* Ex. A, Civil Authority Endorsement, Form SB-146826-B (Ed. 01/08).  Specifically, the Policy obligates Continental to pay for "the actual loss of Business Income [Selane] sustain[s] and reasonable and necessary Extra Expense [Selane] incur[s] caused by action of civil authority that prohibits access to the described premises."  The Policy further provides that this "civil authority action must be due to . . . damage to property at locations, other than described premises, caused by or resulting from a Covered Cause of Loss," which is defined to include all causes except those subject to an exclusion or limitation in the Policy.  *Id.*  The Policy's coverage for Business Income losses begins 24 hours after the time of the civil authority's action and

applies for a period of four consecutive weeks after coverage begins. *Id.* The coverage for Extra Expense begins immediately after the time of the civil authority's action and ends at the same time as the Business Income coverage. *Id.*

20. Critically, unlike many policies that provide Business Income coverage, the Policy and other CNA Connect policies do not include, and are not subject to, any exclusion for losses caused by or resulting from the spread of viruses, communicable diseases, or pandemics. Because losses caused by or resulting from viruses, communicable diseases, and pandemics are not expressly excluded under the Policy, these all constitute Covered Causes of Loss under the Connect Policy form.

21. Selane is informed and believes, and on that basis alleges, that during all relevant times Continental included the same or materially similar forms and endorsements in all "CNA Connect" polices issued to Selane and the Class Members. Accordingly, on information and belief, the provisions, terms, and conditions referenced above are also found in the "CNA Connect" business owners' policies issued by Continental to the Class Members.

22. Selane is informed and believes, and on that basis alleges, that when Continental sold Selane the Policy, and sold the other Class Members CNA Connect policies, it knew for over a decade that there were standard-form exclusions available in the insurance market place that could exclude coverage for losses caused by viruses and pandemics, that other insurers had included such exclusions in policies they sold, and, in fact, that it and other members of the CNA group of insurance companies had included such exclusions in the policies that they sold.

23. Additionally, well before Continental sold its CNA Connect policies to Selane and the other Class Members, Continental knew of the possibility of a pandemic and the potential losses that could be associated with a pandemic. In fact, Continental's corporate parent, CNA Financial Corp., explicitly warned its investors about the potential of "material losses" to CNA and its subsidiaries from

"pandemics" and other "catastrophe events" in its 2018 Form 10-K annual report filed with the U.S. Securities and Exchange Commission, acknowledging that such losses are "an inevitable part of [CNA's] business." CNA Financial Corporation, 2018 Annual Report (Form 10-K) (Feb. 13, 2019). Thus, Continental irrefutably knew about the risks posed by pandemics before it sold the CNA Connect policies to Selane and the Class Members—and Continental and its corporate affiliates recognized that the amounts they could be called upon to pay for such risks presented them with substantial exposure.

24. There were many other publicly available reports about the risks of pandemics and what insurers should do in the months and years before Continental sold these policies to Selane and other Class Members in 2019. *See, e.g.,* "What the 1918 Flu Pandemic Can Teach Today's Insurers," *AIR* (Mar. 29, 2018), https://www.air-worldwide.com/publications/air-currents/2018/What-the-1918-Flu-Pandemic-Can-Teach-Today-s-Insurers/ ("Even with today's technology, a modern severe pandemic would cause substantive direct financial losses to the insurance community. In addition, indirect losses would be severe, most notably on the asset side of the balance sheet.").

25. One insurance industry repository demonstrates the proverbial "tip of the iceberg" about how much information was available to insurers regarding the risks of pandemics. The Insurance Library Association of Boston, founded in 1887, describes itself as "the leading resource for and provider of literature, information services, and quality professional education for the insurance industry and related interests." http://insurancelibrary.org/about-us/. The Association states on its website:

> The past 20 years has seen the rise of a number of
> pandemics. <u>Slate</u> recently published an article on what has
> been learned about treating them in that time. We thought
> it might be apt for us to take a look back and see what the

1    insurance industry has learned as well.

2    http://insurancelibrary.org/pandemics-and-insurance/.  The Association lists more

3    than 15 publications available to the insurance industry since at least early 2007,

4    long *before* Continental sold Selane and other Class Members their CNA Connect

5    policies.

6        26.    Thus, even though Continental was aware of the massive losses that its

7    insureds, including Selane and the Class Members, could face from a virus-related

8    pandemic, it still sold Selane and the Class Members the CNA Connect policies

9    without any potentially applicable exclusion.

10             **THE COVID-19 PANDEMIC AND**

11             **ENSUING CIVIL AUTHORITY ORDERS**

12       27.    COVID-19 is a disease caused by a recently discovered virus known as

13   SARS-CoV-2.  The World Health Organization has named the virus and a resulting

14   disease.  As the World Health Organization has stated:

15       Official names have been announced for the virus

16       responsible for COVID-19 (previously known as "2019

17       novel coronavirus") and the disease it causes.  The official

18       names are:

19       **Disease**

20       coronavirus disease

21       (COVID-19)

22       **Virus**

23       severe acute respiratory syndrome coronavirus 2

24       (SARS-CoV-2).

25   https://www.who.int/emergencies/diseases/novel-coronavirus-2019/technical-

26   guidance/naming-the-coronavirus-disease-(covid-2019)-and-the-virus-that-causes-it.

27       28.    The World Health Organization also has provided a straight-forward

28   example of the distinction between a virus and a disease:

1     Viruses, and the diseases they cause, often have different

2     names.  For example, HIV is the virus that causes AIDS.

3     People often know the name of a disease, such as measles,

4     but not the name of the virus that causes it (rubeola).

5     There are different processes, and purposes, for naming

6     viruses and diseases.

7 *Id.*

8    29. The first reported cases of COVID-19 in humans were diagnosed in or

9 around December 2019 in Wuhan, the capital city of the Hubei Province in China.

10 Since then, SARS-CoV-2 and COVID-19 have spread throughout the world,

11 prompting the World Health Organization to declare a global pandemic.

12    30. As explained by the World Health Organization,

13     [p]eople can catch COVID-19 from others who have the

14     [SARS-CoV-2] virus. The disease spreads primarily from

15     person to person through small droplets from the nose or

16     mouth, which are expelled when a person with COVID-19

17     coughs, sneezes, or speaks. These droplets are relatively

18     heavy, do not travel far and quickly sink to the ground.

19     People can catch COVID-19 if they breathe in these

20     droplets from a person infected with the virus. . . . These

21     droplets can land on objects and surfaces around the

22     person such as tables, doorknobs and handrails.  People

23     can become infected by touching these objects or surfaces,

24     then touching their eyes, nose or mouth.

25 *See* "How does COVID-19 spread?," World Health Organization (April 17, 2020),

26 *available at* https://www.who.int/emergencies/diseases/novel-coronavirus-

27 2019/question-and-answers-hub/q-a-detail/q-a-coronaviruses.

28

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

1     31.     Aerosolized droplets exhaled by normal breathing can travel significant

2  distances and stay suspended in air for hours until gravity ultimately forces them to

3  the nearest surface.  Studies suggest that the SARS-CoV-2 virus can remain

4  contagious on some surfaces for up to six days.  Alex W.H.  Chin, et al., "Stability

5  of SARS-CoV-2 in different environmental conditions," *The Lancet Microbe* (April

6  2, 2020), available at https://www.thelancet.com/journals/lanmic/article/PIIS2666-

7  5247(20)30003-3/fulltext.

8     32.     Since January 1, 2020, there have been more than 21,294,000

9  confirmed cases of COVID-19 throughout the world, more than 761,750 of which

10  have resulted in deaths as of the date of filing of this Complaint.  *See*

11  https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200816-

12  covid-19-sitrep-209.pdf?sfvrsn=5dde1ca2_2.  There have been more than 4,500,000

13  confirmed cases of COVID-19 in the United States, more than 152,000 of which

14  have resulted in deaths.  *Id.*  Moreover, due in part to the initial absence of available

15  tests, it is believed that the true number of coronavirus cases is significantly higher

16  than the reported numbers might suggest.  *See* https://www.nbcnews.com/health/

17  health-news/how-many-people-have-had-coronavirus-no-symptoms-n1187681.

18     33.     In March 2020, in response to the pandemic and the worldwide spread

19  of SARS-CoV-2, civil authorities throughout the United States began issuing "stay

20  home" and "shelter in place" quarantine orders and requiring the suspension of non-

21  essential business operations (collectively, "Closure Orders").

22     34.     To help create a framework for the implementation of such policies in

23  California, Governor Gavin Newsom issued Executive Order N-25-20, ordering

24  that: "All residents are to heed any orders and guidance of state and local public

25  health officials, including but not limited to the imposition of social distancing

26  measures, to control the spread of COVID-19."  Executive Order N-25-20 took

27  effect on March 12, 2020.

28

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

35.     On March 15, 2020, Los Angeles Mayor Eric Garcetti issued a public order prohibiting all dining in restaurants, prohibiting other large gatherings, and strongly discouraging religious gatherings.

36.     On March 16, 2020, the County of Los Angeles Department of Public Health issued an order prohibiting gatherings of more than 50 people.

37.     On March 19, 2020, the County of Los Angeles amended its prior order and mandated the closure of all businesses operating in the County, subject to certain exceptions for "essential" businesses and business activities.  The County of Los Angeles stated that this order was issued in direct response to the "continued rapid spread of COVID-19 and the need to protect the most vulnerable members of our community," adding that the order was "based upon scientific evidence and best practices, as currently known and available, to protect members of the public from avoidable risk of serious illness and death resulting from the spread of COVID-19 . . . ."  The March 19, 2020, Order further recognized that, as of that date, there were "at least 231 cases of COVID-19 and 2 deaths reported in Los Angeles County," noting that "[t]here remains a strong likelihood of significant and increasing number of suspected cases of community transmission."

38.     On March 19, 2020, the State of California issued an Order of the State Public Health Officer, which required all individuals living in the state to stay at home or at their place of residence "except as needed to maintain operations of the federal critical infrastructure sectors."  On that same date, California Governor Newsom issued Executive Order N-33- 20, expressly requiring California residents to follow the March 19, 2020, Order of the State Public Health Officer, and incorporating by reference California Government Code 8665, which provides that "[a]ny person . . .  who refuses or willfully neglects to obey any lawful order . . . issued as provided in this chapter, shall be guilty of a misdemeanor and, upon conviction thereof, shall be punishable by a fine of not to exceed one thousand dollars ($1,000) or by imprisonment for not to exceed six months or by both such

1  fine and imprisonment." The March 19, 2020, Order of the State Public Health

2  Officer and Executive Order N-33- 20 took immediate effect on March 19, 2020,

3  and remain in effect as of the date of this filing.

4      39.   Also on March 19, 2020, Mayor Garcetti issued a Public Order Under

5  City of Los Angeles Emergency Authority with the subject "Safer at Home." Mayor

6  Garcetti's Order stated that "all persons living within the City of Los Angeles are

7  hereby ordered to remain in their homes" and "all businesses within the City of Los

8  Angeles are ordered to cease operations that require in-person attendance by

9  workers at a workplace . . . ." Mayor Garcetti's Order included certain exceptions

10  for "essential" businesses and business activities.

11      40.   On March 21, 2020, the County of Los Angeles Department of Public

12  Health amended and superseded its March 19, 2020 to "comply with Executive

13  Order N-33-20 issued by Governor Newsom." This March 21 Order "specifically

14  requires all business to cease in-person operations and close to the public, unless the

15  business is defined as an Essential Business by this Order."

16      41.   On April 1, 2020, Mayor Garcetti further revised his March 19, 2020,

17  Order. Mr. Garcetti's April 1, 2020, Order reiterated that all Los Angeles residents

18  were required to stay home and mandated the continued closure of non-essential in-

19  person businesses. The April 1, 2020, Order explicitly recognizes that the SARS-

20  CoV-2 virus can spread easily from person to person and "it is physically causing

21  property loss or damage due to its tendency to attach to surfaces for prolonged

22  periods of time."

23      42.   On April 10, 2020, Mayor Garcetti issued a further revised "Safer at

24  Home" Order.   The Order extended all mandated closures through May 15, 2020.

25      43.   Also on April 10, 2020, the County of Los Angeles issued an Order

26  regarding the Temporary Prohibition of All Events and Gatherings and Closure of

27  Non-Essential Businesses and Areas. The April 10, 2020 Order extended all

28  mandated closures through May 15, 2020.

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

44.     On April 27, 2020, May 4, 2020, and May 8, 2020, Mayor Garcetti issued additional updates to his "Safer at Home" Order.  In relevant part, these Orders all required Los Angeles Citizens to stay at home and mandated the continued closure of all non-essential in-person businesses.

45.     The above-referenced and subsequent orders issued by Governor Newsom and other California state officials and agencies are collectively referred to herein as the "California Orders."  The above-referenced and subsequent orders issued by Mayor Garcetti and other Los Angeles County officials and agencies are collectively referred to herein as the "Los Angeles Orders."

46.     The California Orders and the Los Angeles Orders required Selane and the other Class Members to completely or partially suspend their business operations.  These orders also prohibited access to Selane's business premises in Chatsworth and also prohibited access to one or more of the business locations of the other Class Members.

## CONTINENTAL'S BREACHES AND BAD FAITH CONDUCT

47.     As a result of the aforementioned suspensions of their business operations, Selane and other Class Members have sustained covered Business Income losses as defined in their CNA Connect business owners' policies.  These Business Income losses were sustained due to the "necessary 'suspension'" of business operations, as those terms are used in the policies issued to Selane and the other Class Members.  These Business Income losses were caused by the California and/or Los Angeles Orders, which constitute "action(s) of civil authority" as that phrase is used in the policies issued by Continental to Selane and the other Class Members.

48.     Also, as a result of the aforementioned suspensions of their business operations, Selane and other Class Members have incurred "reasonable and necessary Extra Expense," as defined and used in their CNA Connect business owners' policies.  Such Extra Expenses are covered under the policies issued by

Continental to Selane and the other Class Members and were caused by the California and/or Los Angeles Orders, which, as noted, constitute "action(s) of civil authority" as that phrase is used in the CNA Connect policies issued to Selane and the other Class Members.

49.     The California and Los Angeles Orders were issued due to the presence of the SARS-CoV-2 virus in the State of California and County of Los Angeles and the desire to avoid the spread of the virus and the disease that it causes, COVID-19. Because the SARS-CoV-2 virus can adhere to surfaces of property for several days and can linger in the air in buildings for several hours, the presence of the SARS-CoV-2 virus on or around property amounts to "direct physical loss of or damage to property" as that phrase is used in the CNA Connect policies issued by Continental to Selane and the other Class Members.  In fact, given the manner in which SARS-CoV-2 lingers in the air and on surfaces, and its manner of transmission, and the desire to "flatten the curve," Selane's premises and the premises of the other Class Members were not capable of performing their essential functions. Accordingly, the California and Los Angeles Orders substantially impaired the properties, constituting "direct physical or damage of property."  They also constitute "civil authority action(s) . . . due to direct physical loss of or damage to property" as required to trigger Civil Authority coverage under the policies issued to Selane and the other Class Members.

50.     Although Selane and other Class Members have sustained Business Income losses and incurred Extra Expense falling squarely with their policies' Civil Authority coverage, Continental has failed and refused to acknowledge coverage for their losses.

51.     Indeed, after a perfunctory "investigation" into Selane's losses, Continental denied Selane's claim, incorrectly asserting that Selane's losses did not result from civil authority action taken in response to "direct physical loss of or damage to property" caused by a covered peril.  Continental took this position

16

1   notwithstanding the fact that the California and Los Angeles Orders were issued in

2   response to the presence of the SARS-CoV-2 virus in the State of California and the

3   County of Los Angeles, and even though the presence of the SARS-CoV-2 virus on

4   or around property amounts to "direct physical loss of or damage to property" under

5   the governing rules of insurance policy interpretation and California law.

6       52.    Selane is informed and believes, and on that basis alleges, that

7   Continental has denied, or will deny, coverage to other Class Members on the same

8   basis.  Selane is informed and believes, and on that basis alleges, that Continental

9   denied coverage, and continues to deny coverage, on this basis even though it has

10   known since at least 1990 that the contamination of property by a hazardous

11   substance constitutes property damage, and, in fact, has litigated and lost this issue.

12   *See, e.g., AIU Ins. Co. v. Superior Court*, 51 Cal. 3d 807, 842 (1990)

13   ("contamination of the environment satisfies" the requirement of property damage).

14   *See also Western Fire Ins. Co. v. First Presbyterian Church,* 165 Colo. 34, 39-40

15   (1968) (direct physical loss when gasoline contaminated church building making it

16   dangerous to use); *Farmers Ins. Co. v. Trutanich,* 123 Or. App. 6, 9-11 (1993) (odor

17   from methamphetamine "cooking" constituted "direct physical loss"); *Sentinel Mgt.*

18   *Co. v. New Hampshire Ins. Co*., 563 N.W.2d 296, 300 (Minn. Ct. App. 1997)

19   ("Although asbestos contamination does not result in tangible injury to the physical

20   structure of a building, a building's function may be seriously impaired or destroyed

21   and the property rendered useless by the presence of contaminants. . . .  Under these

22   circumstances, we must conclude that contamination by asbestos may constitute a

23   direct, physical loss to property under an all-risk insurance policy.")

24       53.    In denying coverage for Selane's losses, Continental also asserted that

25   even if the civil authority orders had been issued in response to "direct physical loss

26   of or damage to property" (which, again, they were), the Policy included one or

27   more policy exclusions that "might" apply as a bar to coverage for Selane's losses.

28   However, as noted above, the Policy does not include the insurance industry's

standard 2006 virus exclusion.  In fact, the Policy does not include any exclusions conspicuously, plainly, clearly, and unambiguously barring coverage for losses attributable to viruses, communicable diseases, or pandemics.

54.     Continental consciously decided not to include exclusions barring coverage for losses attributable to viruses, communicable diseases, or pandemics. Indeed, numerous property and business interruption insurers issue policies purporting to exclude coverage for losses caused by or resulting from viruses and/or communicable diseases, and such exclusions have been in broad circulation for well over a decade.  For instance, as noted above, in 2006, the Insurance Services Office (or "ISO") introduced a form exclusion titled "Exclusion for Loss Due to Virus or Bacteria."  ISO is responsible for drafting many of the insurance policy forms relied on by property insurers throughout the United States, and many domestic property and business interruption insurers employ ISO forms in their policies.  In the July 6, 2006, circular prepared as part of its filing of the exclusion with state insurance regulators, ISO recognized that viruses could cause property damage, stating:

> Disease-causing agents may render a product impure (change its quality or substance), or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property.  When disease-causing viral or bacterial contamination occurs, potential claims involve the cost of replacement of property (for example, the milk), cost of decontamination (for example, interior building surfaces), and business interruption (time element) losses.  Although building and personal property could arguably become contaminated (often temporarily) by such viruses and bacteria, the nature of the property itself would have a bearing on whether there is actual property damage.

Thus, ISO and the insurance industry have long recognized that the presence of a virus on or around property can constitute direct physical loss of or damage to property, and many insurers throughout the country employ exclusions purportedly designed to limit or bar coverage for certain losses and expenses caused by the presence of a virus.  Continental chose not to do so in the policies it issued to Selane and the Class Members.

55.     Further underscoring the deliberate nature of Continental's decisions, Continental and its corporate affiliates issue hundreds or thousands of policies every year using their "Paramount Business Package Policy" forms.  Unlike the CNA Connect policies issued by Continental, the Paramount policies purport to exclude coverage for certain losses or damage caused by or resulting from the presence of viruses.  Continental consciously decided not to include such exclusions in the policies to Selane and the other Class Members.

56.     Continental denied coverage for Selane's losses without adequately evaluating or investigating Selane's claim.  Selane is informed and believes, and on that bases alleges, that Continental's denial of coverage for Selane's losses was part of a coordinated scheme perpetrated by Continental and its corporate affiliates to wrongfully withhold policy benefits due to Selane and the Class Members for losses attributable to SARS-CoV-2, COVID-19, and associated actions and orders of civil authorities and, more broadly, to mislead Selane, the Class Members, and the general public into believing that CNA Connect business owner's policies do not afford coverage for such losses.

57.     In furtherance of this coordinated scheme to wrongfully withhold policy benefits and mislead Selane, the Class Members, and the general public, Dino Robusto—the Chairman and Chief Executive Officer of CNA Financial Corp., Continental's ultimate corporate parent—made a number of material misrepresentations and misstatements during a recent earnings call with CNA's investors.

19

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

58.    Specifically, during a May 4, 2020, earnings call, Mr. Robusto addressed CNA's investors and falsely stated:

> [O]ur property policies, whether issued in the U.S. or international, all have exclusions barring coverage for viruses. There are a very few policies where coverage may exist on small participations in our Lloyd's operation, but the total limit exposed is de minimis.  So with respect to business interruption, our property policy exclusionary language does not provide coverage for COVID-19, and as such, we never collected premiums for it.

https://www.yahoo.com/news/edited-transcript-cna-earnings-conference-124725935.html.

59.    At the time he made these misstatements during the May 4, 2020, earnings call, Mr. Robusto knew or should have known that the CNA Connect business owner's policies issued to Selane and the other Class Members do not contain any exclusions barring coverage for viruses, communicable diseases, or pandemics.  Mr. Robusto also knew or should have known that such misstatements would have the effect of misleading Selane and the other Class Members, as well as CNA's investors and the general public, into believing that CNA Connect policies contained virus exclusions that would preclude coverage for losses attributable to SARS-CoV-2, COVID-19, and associated actions and orders of civil authorities.

60.    As of the date of this filing, Mr. Robusto has not publicly corrected his May 4, 2020, misrepresentations or otherwise publicly clarified that CNA Connect business owners' policies issued to Selane and the Class Members do not contain any exclusions for viruses, communicable diseases, or pandemics.

61.    Likewise, as of the date of this filing, Continental has not publicly repudiated Mr. Robusto's May 4, 2020, misrepresentations or otherwise publicly

clarified that CNA Connect business owners' policies issued to Selane and the Class Members do not contain any exclusions for viruses, communicable diseases, or pandemics.

62.     Through its bad faith claims handling practices and participation in a campaign to mislead Selane and the other Class Members, Continental has breached its contractual obligations, acted in bad faith, and engaged in unfair business practices.

63.     Continental's wrongful conduct as alleged herein has caused, and will continue to cause, significant damage to Selane and other Class Members.

64.     To the extent not waived or otherwise excused, Selane and the other Class Members have complied with all terms and conditions precedent contained in the policies sold to them by Continental.  Therefore, Selane and the other Class Members are entitled to all benefits of insurance provided by their policies.

## CLASS ALLEGATIONS

65.     Selane brings this action pursuant to Rules 23(a), 23(b)(1), 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, on behalf of itself and all others similarly situated.

66.     Selane seeks to represent the following Class and Subclasses:

      a.     **The Class**: All businesses with physical locations in the State of California that (i) sustained Business Income losses and/or incurred Extra Expense as a result of the California Orders and/or the Los Angeles Orders and (ii) purchased a CNA Connect business owner's insurance policy from Continental that (a) was in effect between March 12, 2020, through March 19, 2020; (b) provided Business Income and Extra Expense coverage pursuant to Form SB146802E04 (Ed. 6-16); and (c) provided Civil Authority coverage pursuant to Form SB-146826-B (Ed. 01/08).

b.  **California Breach Subclass:** All members of the Class (as defined in subparagraph a. above) that: (i) were forced to completely or partially suspend their business operations in response to the California Orders; (ii) sustained Business Income losses and/or incurred Extra Expense as a result of the California Orders; (iii) sought coverage for such losses and/or expenses under their CNA Connect business owner's policies issued by Continental; and (iv) were denied coverage by Continental for such losses and/or expenses.

c.  **Los Angeles Breach Subclass:** All members of the Class (as defined in subparagraph a. above) that: (i) were forced to completely or partially suspend their business operations in response to the Los Angeles Orders; (ii) sustained Business Income losses and/or incurred Extra Expense as a result of the Los Angeles Orders; (iii) sought coverage for such losses and/or expenses under their CNA Connect business owner's policies issued by Continental; and (iv) were denied coverage by Continental for such losses and/or expenses.

67.  Excluded from each defined Class is Continental and any of its members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; governmental entities; and the Court staff assigned to this case and their immediate family members.  Selane reserves the right to modify or amend the definitions of the Class and Subclasses, as appropriate, during the course of this litigation.

68.  This action has been brought and may properly be maintained on behalf of the Class and each Subclass proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

69.     **Numerosity—Federal Rule of Civil Procedure 23(a)(1).**  The members of the Class and Subclasses are so numerous that individual joinder of all Class and Subclass members is impracticable.  While Selane is informed and believes that there are hundreds or thousands of members of the Class, and hundreds or thousands of members of each Subclass, the precise number of Class and Subclass members is unknown to Selane but may be ascertained from Continental's books and records.  Members of the Class and Subclasses may be notified of the pendency of this action by recognized, Court approved notice dissemination methods, which may include U.S.  Mail, electronic mail, internet postings, and/or published notice.

70.     **Commonality—Federal Rule of Civil Procedure 23(a)(2).**  This action involves common questions of law and fact, including but not limited to:

a.   Whether the CNA Connect policies issued to the Class Members afford coverage for Business Income losses sustained and Extra Expense incurred as a result of the California Orders;

b.   Whether the CNA Connect policies issued to the Class Members afford coverage for Business losses sustained and Extra Expense incurred as a result of the Los Angeles Orders;

c.   Whether the presence of SARS-CoV-2 on or in property constitutes "direct physical loss of or damage to property" as that phrase is used in the CNA Connect policies issued to the Class Members;

d.   Whether the California Orders constitute "action(s) of civil authority" as that phrase is used in the CNA Connect policies issued to the Class Members;

e.   Whether the Los Angeles Orders constitute "action(s) of civil authority" as that phrase is used in the CNA Connect policies issued to the Class Members;

f.   Whether the California Orders were issued due to "direct physical loss

of or damage to property" as that phrase is used in the CNA Connect policies issued to the Class Members;

g. Whether the Los Angeles Orders were issued due to "direct physical loss of or damage to property" as that phrase is used in the CNA Connect policies issued to the Class Members;

h. Whether the CNA Connect policies issued to the Class Members include any exclusions that would bar coverage for losses sustained and expenses incurred as a result of the California Orders;

i. Whether the CNA Connect policies issued to the Class Members include any exclusions that would bar coverage for losses sustained and expenses incurred as a result of the Los Angeles Orders;

j. Whether Continental wrongfully denied the claims of the California Breach Subclass;

k. Whether Continental wrongfully denied the claims of the Los Angeles Breach Subclass;

l. Whether Continental has breached the implied covenant of good faith and fair dealing in denying coverage for the claims of the California Breach Subclass;

m. Whether Continental has breached the implied covenant of good faith and fair dealing in denying coverage for the claims of the Los Angeles Breach Subclass;

n. Whether Selane and the Class members are entitled to an injunction to prohibit Continental from denying coverage for Business Income losses sustained and Extra Expense incurred as a result of the California Orders;

o. Whether Selane and the Class members are entitled to an injunction to prohibit Continental from denying coverage for Business Income losses

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

sustained and Extra Expense incurred as a result of the Los Angeles Orders;

p.  Whether Selane and the Class Members are entitled to an injunction requiring Continental to correct public misstatements of its corporate affiliates, including by CNA Financial CEO Dino Robusto, regarding the availability of coverage for losses sustained and expenses incurred in connection with SARS-CoV-2, COVID-19, and associated actions and orders of civil authorities; and

q.  Whether Selane and the Class are entitled to an award of reasonable attorneys' fees, interest and costs.

71.  **Predominance—Federal Rule of Civil Procedure 23(b)(3).**  The questions set forth above predominate over any questions affecting only individual persons, and a class action is superior with respect to considerations of consistency, economy, efficiency, fairness, and equity to other available methods for the fair and efficient adjudication of the claims asserted herein.  Specifically, hundreds or thousands of California business are impacted by Continental's failure and refusal to acknowledge coverage for Business Income losses sustained and Extra Expense incurred as a result of the California and Los Angeles Orders, and their claims arise from a common factual predicate.

72.  **Typicality—Federal Rule of Civil Procedure 23(a)(3).**  Selane's claims are typical of the clams of the other members of the Class and Subclasses because Selane and the other members of the Class and Subclasses are all similarly affected by Continental's failure and refusal to acknowledge coverage for Business Income losses sustained and Extra Expense incurred as a result of the California and Los Angeles Orders.  Selane's claims are based upon the same legal theories as those of the other members of the Class and Subclasses.  Selane and other members of the Class sustained damages as a direct and proximate result of the same wrongful practices and positions of Continental.

73.     **Adequacy of Representation—Federal Rule of Civil Procedure 23(a)(4).**  Selane will fairly and adequately represent and protect the interests of the other members of the Class and Subclasses that Selane seeks to represent.  Selane has retained counsel competent and experienced in complex insurance coverage litigation and complex class action litigation, including consumer protection litigation.  Selane intends to prosecute this action vigorously.  Neither Selane nor its counsel have interests that conflict with the interests of the other Class members.

74.     **Inconsistent or Varying Adjudications and the Risk of Impediments to Other Class Members' Interests—Federal Rule of Civil Procedure 23(b)(1).**  Selane seeks class-wide adjudication as to the interpretation, and resultant scope, of Continental's Business Income and Extra Expense and Civil Authority coverages. The prosecution of separate actions by individual members of the Class and Subclasses would create an immediate risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Continental.  Moreover, the adjudications sought by Selane could, as a practical matter, substantially impair or impede the ability of other members of the Class and Subclasses, who are not parties to this action, to protect their interests.

75.     **Declaratory and Injunctive Relief—Federal Rule of Civil Procedure 23(b)(2).**  Continental acted or refused to act on grounds generally applicable to Selane and the other Class members, thereby making appropriate final declaratory relief and injunctive relief, as described below, with respect to the members of the Class and the Subclasses.

76.     **Superiority—Federal Rule of Civil Procedure 23(b)(3).**  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer

1   management difficulties, and provides the benefits of single adjudication, economy

2   of scale, and comprehensive supervision by a single court.

3   <u>**PRIVATE ATTORNEY GENERAL ALLEGATIONS**</u>

4   77.   Selane brings this action, in part, in equity to enjoin Continental's

5   scheme of unfair business practices.  This Court has the power to enjoin such

6   practices under California Business and Professions Code section 17205.  Selane

7   brings this action on behalf of all of the members of the general public of the State

8   of California, as permitted by California Business and Professions Code section

9   17204.

10   <u>**FIRST COUNT**</u>

11   ***For Breach of Contract***

12   **(Brought on Behalf of Selane and the California Breach Subclass)**

13   78.   Selane realleges and incorporates by reference paragraphs 1 through 77

14   above.

15   79.   Selane brings this Count individually and on behalf of the other

16   members of the California Breach Subclass.

17   80.   Continental breached its duties under the policies that it issued to

18   Selane and the other California Breach Subclass members by, among other things:

19       a.   Failing and refusing to pay for Business Income losses sustained

20          and/or Extra Expense incurred as a result of the California

21          Orders;

22       b.   Refusing to pay for the amounts that Selane and the other

23          California Breach Subclass members reasonably spent to reduce

24          their losses, even though their policies require them to "mitigate"

25          their losses and both their policies and common law obligate

26          Continental to pay for amounts reasonably incurred in an effort

27          to mitigate loss; and

28       c.   Otherwise acting as alleged above.

81.     As a direct and proximate result of Continental's contractual breaches, Selane and the other California Breach Subclass members have sustained, and continue to sustain, substantial damages for which Continental is liable, in amounts to be established at trial.  Selane and the other California Breach Subclass members also are entitled to interest on their damages at the legal rate.  Selane and the other California Breach Subclass Members continue to suffer damages because of Continental's contractual breaches and will seek leave to amend this complaint once they ascertain the full extent of their damages.

## SECOND COUNT

### *For Breach of Contract*

**(Brought on Behalf of Selane and the Los Angeles Breach Subclass)**

82.     Selane realleges and incorporates by reference paragraphs 1 through 77 above.

83.     Selane brings this Count individually and on behalf of the other members of the Los Angeles Breach Subclass.

84.     Continental breached its duties under the policies that it issued to Selane and the other Los Angeles Breach Subclass members by, among other things:

   a.     Failing and refusing to pay for Business Income losses sustained and/or Extra Expense incurred as a result of the Los Angeles Orders;

   b.     Refusing to pay for the amounts that Selane and the other Los Angeles Breach Subclass members reasonably spent to reduce their losses, even though their policies require them to "mitigate" their losses and both their policies and common law obligate Continental to pay for amounts reasonably incurred in an effort to mitigate loss; and

   c.     Otherwise acting as alleged above.

85.     As a direct and proximate result of Continental's contractual breaches, Selane and the other Los Angeles Breach Subclass members have sustained, and continue to sustain, substantial damages for which Continental is liable, in an amount to be established at trial.  Selane and the other Los Angeles Breach Subclass members also are entitled to interest on their damages at the legal rate.  Selane and the other Los Angeles Breach Subclass Members continue to suffer damages because of Continental's contractual breaches and will seek leave to amend this complaint once they ascertain the full extent of their damages.

### THIRD COUNT

*For Tortious Breach of the Implied Covenant of Good Faith and Fair Dealing*

**(Brought on Behalf of Selane and**

**the California and Los Angeles Breach Subclasses)**

86.     Selane realleges and incorporates by reference paragraphs 1 through 77, 79 through 81, and 83 through 85 above.

87.     Selane brings this Count individually and on behalf of the other members of the California Breach Subclass and Los Angeles Breach Subclass (collectively, "Breach Subclass" members).

88.      Implied in the Policy was a covenant that Continental would act in good faith and deal fairly with Selane and the Breach Subclass members, that Continental would do nothing to interfere with right of Selane and the Breach Subclass members to receive benefits due under their respective CNA Connect policies, and that Continental would give at least the same level of consideration to the interests of Selane and the Breach Subclass members as it gave to its own interests.

89.     Continental also had a duty under the policies it issued to Selane and the Breach Subclass members, the law, and insurance industry custom, practice, and standards to conduct a prompt and thorough investigation, including as to all bases

1  that might support Selane and the Breach Subclass members' respective claims for

2  insurance coverage before reserving rights to deny, and denying, coverage.

3       90.    Instead of complying with these duties, Continental acted in bad faith

4  by, among other things, systematically and uniformly:

5            a.  failing to conduct a full and thorough investigation of Selane and

6                the Breach Subclass members' respective claims for insurance

7                coverage and asserting grounds for denying coverage without

8                conducting such investigation;

9            b.  wrongfully and unreasonably asserting grounds for denying

10               coverage that Continental knew, or should have known, are not

11               supported by, and in fact are contrary to, the terms of the CNA

12               Connect policies, the law, insurance industry custom and practice,

13               and the facts;

14           c.  failing to fully inquire into the bases that might support coverage for

15               Selane and the Breach Subclass members' respective claims;

16           d.  failing to conduct an adequate investigation of the losses suffered by

17               Selane and the Breach Subclass members, and asserting grounds for

18               disputing coverage based on its inadequate investigation;

19           e.  unreasonably failing and refusing to honor its promises and

20               representations in the CNA Connect policies it issued to Selane and

21               the Breach Subclass members;

22           f.  giving greater consideration to its own interests than it gave to the

23               interests of Selane and the Breach Subclass members; and

24           g.  otherwise acting as alleged above.

25      91.    In breach of the implied covenant of good faith and fair dealing,

26 Continental did the things and committed the acts alleged above for the purpose of

27 consciously withholding from the Selane and the Breach Subclass members the

28 rights and benefits to which they are and were entitled under their policies.

92.    Continental's actions are inconsistent with the reasonable expectations of Selane and the Breach Subclass members, are contrary to established industry custom and practice, are contrary to legal requirements, are contrary to the express terms of the CNA Connect issued to Selane and the Breach Subclass members, and constitute bad faith.

93.    As a direct and proximate result of Continental's actions, Selane and the Breach Subclass members has been damaged in an amount exceeding the Court's jurisdictional limits.  Also, pursuant to *Brandt v. Superior Court*, 37 Cal. 3d 813 (1985), Selane and the Breach Subclass members are entitled to recover all attorneys' fees they reasonably incurred, and continue to incur, in the efforts to obtain the benefits due under the CNA Connect policies that Continental has withheld, and is withholding, in bad faith.  Selane and the Breach Subclass members are entitled to interest at the maximum legal rate.

94.    Selane and the Breach Subclass members are informed and believe, and on that basis allege, that Continental, acting through one or more of its officers, directors, or other corporate employees with substantial independent and discretionary authority over significant aspects of its business, performed, authorized, or ratified the bad faith conduct alleged above.

95.    Continental's conduct is despicable and has been done with a conscious disregard of the rights of Selane and the Breach Subclass members, constituting oppression, fraud, or malice.  Continental engaged in a series of acts designed to deny the Selane and the Breach Subclass members the benefits due under the Policy. Specifically, Continental, by acting as alleged above, in light of information, facts, and relevant law to the contrary, consciously disregarded the Selane and the Breach Subclass members respective rights and forced Selane and the Breach Subclass members to incur substantial financial losses, thereby inflicting substantial financial damage on the Selane and the Breach Subclass members.  Continental ignored the Selane and the Breach Subclass members' interests and concerns with the requisite

1  intent to injure within the meaning of California Civil Code section 3294.

2  Therefore, Selane and the Breach Subclass members are entitled to recover punitive

3  damages from Continental in an amount sufficient to punish and make an example

4  of Continental and to deter similar conduct in the future.

5  ## FOURTH COUNT

6  ### For Unfair Business Practices - Cal. Bus. & Prof. Code §§ 17200, et seq.

7  ### (Brought on Behalf of Selane and the Class)

8  96.    Selane realleges and incorporates by reference paragraphs 1 through

9  77, 79 through 81, 83 through 85, and 87 through 95 above.

10  97.    Selane brings this Count individually and on behalf of the other

11  members of the Class.

12  98.    By its conduct alleged herein, Continental has engaged in unlawful,

13  unfair, and fraudulent business practices in violation of California Business &

14  Professions Code sections 17200 *et seq.* ("UCL").

15  99.    Continental's conduct alleged herein violates the "unlawful" prong of

16  the UCL because it violates the letter and spirit of California's Insurance Code,

17  including California Insurance Code section 790, *et seq.* because, *inter alia*,

18  Continental and its corporate affiliates have disseminated false information

19  regarding the availability of coverage for losses and expenses incurred in connection

20  with the pandemic.  Specifically, notwithstanding the broad promises of Continental

21  and its affiliates in marketing materials and in the policies issued to members of the

22  Class, CNA Financial CEO Dino Robusto made misrepresentations and

23  misstatements during May 2020 earnings call with CNA's investors, falsely stating

24  that all property policies issued in the United States by CNA subsidiaries "have

25  exclusions barring coverage for viruses," adding that this "property policy

26  exclusionary language does not provide coverage for COVID-19."  These and

27  similar statements appear designed to mislead or discourage Continental insureds

28  from pursuing legitimate claims for coverage, damaging their financial interests and

32

1  protecting Continental's financial interesting by decreasing amounts that

2  Continental otherwise would pay insureds for their losses.  As of the date of this

3  filing, Continental has not publicly repudiated or corrected Mr. Robusto's

4  misrepresentations, which were and are untrue with respect to CNA Connect

5  business owners' policies issued to Selane and the members of the Class.

6      100.   In addition, Continental failed or refused to perform a fair, objective,

7  and thorough investigation of claims for coverage made by Selane and the other

8  members of the California and Los Angeles Breach Subclasses.  As alleged herein,

9  Continental denied the claims of Selane and the other members of the California and

10  Los Angeles Breach Subclasses as part of a broader scheme to systematically and

11  categorically deny coverage for losses suffered and expenses incurred related to the

12  coronavirus pandemic and the subsequent actions and orders of state and local civil

13  authorities.  In acting as alleged herein, Continental ignored California requirements

14  concerning the proper and fair evaluation of claims and interpretations of its CNA

15  Connect insurance policies.  Continental's conduct alleged herein also constituted

16  breaches of contract and breaches of the implied covenant of good faith and fair

17  dealing, in violation of California common law.

18      101.   Continental's conduct alleged herein also violates the "unfair" prong

19  of the UCL.  Continental's unfair conduct, as alleged herein, includes but is not

20  limited to Continental's: (a) public misstatements regarding the availability of

21  coverage for COVID-19 losses; (b) categorical and wrongful denial of claims made

22  by Selane and other members of the California and Los Angeles Breach Subclasses

23  under the circumstances described in this complaint; (c) failure and refusal to

24  perform a fair, objective, good-faith, and thorough investigation of the claims as

25  directed by the California Insurance Code; and (d) failing to interpret its policies in

26  an equitable manner and/or in compliance with the standards required by California

27  law (including those articulated in California Insurance Code section 790, *et seq.,*

28

1  and California's Fair Claims Settlement Practices Regulations, 10 California Code
2  of Regulations section 2695.1, *et seq.*).

3  102.  Continental's conduct alleged herein also violates the "fraudulent"
4  prong of the UCL.  Among other things, Continental: (a) promised Selane and the
5  other members of Class coverage that was not provided and that Continental had no
6  intention of providing; (b) promised to evaluate each claim individually, reasonably,
7  and in good faith, when Continental did not actually intend to do; and (c) falsely and
8  misleadingly indicated to Selane and members of the Class that CNA Connect
9  policies do not afford coverage for losses suffered and expenses incurred related to
10  the pandemic and the subsequent actions and orders of state and local civil
11  authorities.

12  103.  Continental's conduct alleged herein is immoral, unethical, oppressive,
13  unscrupulous, unconscionable, and/or substantially injurious to Selane and the other
14  members of the Class.  There is no utility to Continental's conduct, and even if there
15  were any utility, it would be significantly outweighed by the gravity of the harm to
16  consumers caused by Continental's conduct as alleged herein.

17  104.  Continental's conduct alleged herein also violates California public
18  policy, including as such policy is reflected in California Insurance Code section
19  790, *et seq.*, elsewhere in the California Insurance Code, and in and California's Fair
20  Claims Settlement Practices Regulations, 10 California Code of Regulations section
21  2695.1, *et seq.*

22  105.  Continental's fraudulent and deceptive conduct alleged herein was false
23  and misleading, had a tendency to deceive reasonable insureds, and did deceive
24  Selane and the other members of the Class.  Selane and the other members of the
25  Class reasonably relied on Continental's deceptions and omissions alleged herein.

26  106.  Selane and the other members of the Class are entitled to an injunction
27  from this Court precluding Continental from denying coverage to Selane and the

28

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

other members of the Class for Business Income losses sustained and/or Extra Expense incurred as a result of the California Orders and the Los Angeles Orders.

107. Selane and the other members of the Class are further entitled to a mandatory injunction from this Court requiring Continental to publicly correct misstatements made by Continental and its affiliates—including but not limited to those made during Dino Robusto's May 4, 2020, earnings call with CNA investors—regarding the availability of coverage under CNA Connect business owners' policies for losses sustained and expenses incurred in connection with the coronavirus pandemic.

108. Pursuant to California Code of Civil Procedure section 1021.5, Selane is entitled to recover its reasonable attorney's fees.

## FIFTH COUNT OF ACTION

### *For Declaratory Judgment*

**(Brought on Behalf of Selane and the Class)**

109. Selane realleges and incorporates by reference paragraphs 1 though 77, above.

110. Selane brings this Count individually and on behalf of the other members of the Class.

111. Selane contends that it and the members of the Class are entitled to coverage under their CNA Connect policies for Business Income losses suffered and/or Extra Expense incurred as a result of the California Orders. Selane is informed and believes, and on that basis alleges, that Continental disputes that Selane and the other members of the Class are entitled to such coverage. Therefore, an actual and justiciable controversy exists between Selane and the members of the Class, on the one hand, and Continental, on the other.

112. Pursuant to 28 U.S.C. § 2201, Selane seeks a judicial declaration from this Court confirming that Selane's contentions, as stated above, are correct. A

1 declaration is necessary in order that the parties' dispute may be resolved and that

2 they may be aware of their respective rights and duties.

3 **PRAYER FOR RELIEF**

4 WHEREFORE, Selane, individually and on behalf of the members of the

5 Class and Subclasses, prays for relief as follows:

6 **CLASS CERTIFICATION**

7 1.     For an order certifying the proposed Class and Subclasses, as defined

8 herein, designating Selane as Class representative, and appointing Selane's

9 undersigned attorneys as Counsel for the Class and Subclasses;

10 **ON THE FIRST COUNT**

11 2.     For damages according to proof at the time of trial, plus interest;

12 **ON THE SECOND COUNT**

13 3.     For damages according to proof at the time of trial, plus interest;

14 **ON THE THIRD COUNT**

15 4.     For damages according to proof at the time of trial, including

16 reasonable attorneys' fees incurred in obtaining the benefits due under the policies

17 issued by Continental to Selane and/or the Class Members, plus interest; and

18 5.     For punitive damages in an amount to be determined at the time of trial;

19 **ON THE FOURTH COUNT**

20 6.     For injunctive relief in accord with Selane's contentions stated above;

21 7.     For an award of reasonable attorneys' fees pursuant to California Code

22 of Civil Procedure section 1021.5;

23 **ON THE FIFTH COUNT**

24 8.     For declarations in accord with Selane's contentions stated above;

25 **ON ALL COUNTS:**

26 9.     For the costs of this lawsuit; and

27

28

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

10.     For such other, further, or different relief as the Court may deem just and proper.

Dated:  August 27, 2020                         PASICH LLP

                                        By: /s/ Shaun H. Crosner

                                            Shaun H. Crosner
                                            Attorneys for Plaintiffs

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs hereby demand a trial by jury in this action.

Dated:  August 27, 2020                    PASICH LLP


                                           By:_/s/ Shaun H. Crosner_____

                                              Shaun H. Crosner
                                              Attorneys for Plaintiffs

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**